91 F.3d 166
 NOTICE: Federal Circuit Local Rule 47.6(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
Edward H. SMITH, William H. Smith, Charles L. Wasem, III,
Dymex, Inc., G & S Foundry & Manufacturing
Company, Inc., and Henry Smith &
Company, Inc., Plaintiffs-Appellants,
v.
JOHNSON PROPELLER COMPANY, INC., and Gary E. Johnson,
Defendants-Appellees.
 95-1406
 United States Court of Appeals, Federal Circuit.
 April 24, 1996.
Rehearing Denied; Suggestion for Rehearing In Banc Declined
July 25, 1996.
 
 Before PLAGER, Circuit Judge, SMITH, Senior Circuit Judge, and LOURIE, Circuit Judge.
 DECISION
 LOURIE, Circuit Judge.
 
 
 1
 Edward H. Smith, William H. Smith, Charles L. Wasem, III, Dymex, Inc., G & S Foundry & Manufacturing Company, Inc., and Henry Smith & Company, Inc. (collectively "Smith") appeal from the judgment of the United States District Court for the Eastern District of Michigan granting the defendants' motion to dismiss their claim for patent infringement based on an alleged settlement agreement. Smith v. Johnson Propeller Co., No. 93-CV-75463 (E.D.Mich. May 31, 1995). Because the district court erred as a matter of law in concluding that the parties had an enforceable settlement agreement, we vacate and remand.
 
 DISCUSSION
 
 2
 Smith sued Johnson Propeller Company, Inc. and Gary E. Johnson (collectively "Johnson" or "defendants") for infringement of U.S. Patent 4,632,636, which claims a propeller with blades having regressive pitch. During a third party deposition of an employee of Mercury Marine, two propellers were produced which, according to Johnson, constituted prior art that invalidated claims 1 and 15 of the '636 patent. The parties subsequently entered into settlement negotiations, during which Johnson's counsel, John Halan, sent a letter to Smith's counsel, John Benefiel, dated August 26, 1994, confirming an offer to settle. The text of the letter reads as follows:
 
 Dear [Benefiel]:
 
 3
 This will verify that you have offered to terminate this litigation in accordance with the following conditions:
 
 
 4
 1. Plaintiffs will dismiss all claims with prejudice.
 
 
 5
 2. Defendants will dismiss all claims without prejudice.
 
 
 6
 3. Plaintiffs will stipulate to an order that claims 1 and 15 are invalid.
 
 
 7
 Please sign below where indicated to confirm this offer, fax a copy back to our office today, and I will forward your proposal to Johnson Propeller.
 
 
 8
 [signed by Halan]
 
 
 9
 Benefiel signed the letter to confirm the offer and faxed a signed copy to Halan. Halan then responded to the letter by suggesting additional terms consisting of requiring Smith to remove the patent number from propellers and send letters to individuals in the trade indicating that the patent is invalid, and paying Johnson's attorney fees. Johnson's counsel also faxed to Benefiel a list of taxable costs to be paid by Smith. Benefiel then responded in a letter to Halan dated September 13, 1994, stating that he could not agree to most of Johnson's requested costs. Later that day, Benefiel and Halan further discussed terms of the potential settlement. According to Johnson, this conversation resulted in an oral agreement to settle the case. Halan faxed to Benefiel an unsigned proposed consent judgment that documented the terms of the alleged oral agreement. At this point, the discussions broke down, Johnson alleging that the parties had reached an agreement, and Smith, who had by then hired new counsel, alleging that there was no agreement. Johnson filed a motion to enforce the alleged settlement agreement and dismiss the complaint.
 
 
 10
 In determining whether to enforce a purported settlement agreement, a district court must look to controlling state law. Bamerilease Capitol Corp. v. Nearburg, 958 F.2d 150, 152 (6th Cir.), cert. denied, 506 U.S. 867 (1992). Michigan Court Rule 2.507(H) governs the enforceability of a settlement agreement in this case and reads as follows:
 
 
 11
 An agreement or consent between the parties or their attorneys respecting the proceedings in an action, subsequently denied by either party, is not binding unless it was made in open court, or unless evidence of the agreement is in writing, subscribed by the party against whom the agreement is offered or by that party's attorney.
 
 
 12
 According to Johnson, the August 26 letter satisfies the requirements of the rule. The district court agreed and found that the August 26 letter evidenced a settlement agreement and was signed by Smith's counsel, thus satisfying the rule's "writing" and subscription requirements. The district court accordingly granted Johnson's motion and dismissed the complaint. Smith now appeals. Johnson alleges that Smith's appeal is frivolous.
 
 
 13
 We review de novo a district court's interpretation of state law, in this case the application of rule 2.507(H). See Salve Regina College v. Russell, 499 U.S. 225, 231 (1991); Abbott Lab. v. Brennan, 952 F.2d 1346, 1355, 21 USPQ2d 1192, 1200 (Fed.Cir.1991), cert. denied, 505 U.S. 1205 (1992). We are guided by Michigan law for purposes of interpreting the rule.
 
 
 14
 Smith argues that the requirements of rule 2.507(H) have not been met and that the district court therefore erred in dismissing its complaint. According to Smith, there is no written evidence of an agreement, as required by the rule, and the August 26 letter is nothing more than evidence of an offer. Smith also asserts that Johnson's reply with additional terms was a counteroffer, which rejected the original offer and precluded Johnson from later accepting the offer. Johnson responds that the August 26 letter is written evidence of an agreement signed by Smith's counsel and that it therefore satisfies the requirements of the rule.
 
 
 15
 The courts that have interpreted rule 2.507(H) have found it to have been satisfied when the writing contained evidence that an agreement was reached. For example, in Reed v. Citizens Insurance Company of America, 499 N.W.2d 22 (Mich.Ct.App.1993), appeal denied, 514 N.W.2d 773 (Mich.1994), the plaintiff signed a proposed settlement agreement prepared by the defendant which was held to be sufficient to meet the requirements of the rule. Id. at 25. In Energy Acquisition Corp. v. Harbor Insurance Co., 1990 U.S. Dist. LEXIS 11653 (W.D.Mich.1990), the defendants' counsel had sent to the plaintiffs' counsel, after several exchanges of offers and counteroffers, a proposed draft settlement agreement with a signed cover letter. The plaintiffs accepted the agreement orally and documented that in a follow-up letter. The court held that the proposed draft agreement satisfied the "writing" requirement, and the accompanying signed letter satisfied the subscription requirement. Id.
 
 
 16
 at * 9. In Nelson v. Consumers Power Co., 497 N.W.2d 205 (Mich.Ct.App.1993), the plaintiff's attorney sent a signed letter to defense counsel confirming a $20,000 settlement. The letter referred to a settlement, thus satisfying the "writing" requirement, and the attorney's signature on the letter satisfied the subscription requirement. Id. at 209 n. 2. All of these cases involved evidence of an agreement, as opposed to evidence of an offer. In contrast, the Court of Appeals of Michigan has held in several cases that rule 2.507(H) was not met where there was only a disputed oral agreement and no written evidence of such agreement. Fear v. Rogers, 526 N.W.2d 197, 198 (Mich.Ct.App.1994) (stating that a disputed oral agreement allegedly made during a settlement conference was unenforceable); Metropolitan Life Ins. Co. v. Goolsby, 418 N.W.2d 700, 701-02 (Mich.Ct.App.1987) (stating that an alleged oral settlement agreement, denied by the appellants, was unenforceable); Gojcaj v. Moser, 366 N.W.2d 54, 58 (Mich.Ct.App.1985) ("Until plaintiffs or their attorney signed such a writing or the settlement was made in open court, they were free to disavow the alleged oral agreement."); Rossi v. Transamerica Car Leasing Co., 368 N.W.2d 880, 881 (Mich.Ct.App.1984) (stating that an alleged oral settlement agreement, consistently denied by the plaintiffs, was unenforceable).
 
 
 17
 Using the guidance of the Michigan cases, we must consider whether the August 26 letter satisfied the requirements of rule 2.507(H), as the trial court held. Smith's counsel signed the letter to confirm the offer, but the letter does not evidence an agreement. It states that "this will verify that you [Smith] have offered to terminate this litigation" and it outlines the terms of the offer. The entire text of the letter emphasizes that it is an offer, providing the terms of the offer; nothing in the letter indicates that an agreement was reached. The writing thus does not evidence an agreement as is required by rule 2.507(H). We do not need to decide whether all provisions of an agreement must be in writing, because that issue is not before us, but the writing must as least indicate that there was an agreement, and the August 26 letter evidences nothing more than an offer to settle. See Gojcaj, 366 N.W.2d at 58 ("[N]o alleged settlement agreement is binding on plaintiffs unless the settlement terms are in a writing subscribed by plaintiffs or their attorney."); see also Metropolitan Life Ins., 418 N.W.2d at 701-02.
 
 
 18
 Furthermore, the August 26 letter contains no indication of an acceptance of the offer. Smith's counsel only confirmed the offer. The signature of Johnson's counsel on the letter was not an acceptance of Smith's offer; it was at best an acknowledgment of the offer and a request that it be put in writing. See Pakideh v. Franklin Commercial Mortgage Group, Inc., 540 N.W.2d 777, 780 (Mich.Ct.App.1995) ("Unless an acceptance is unambiguous and in strict conformance with the offer, no contract is formed."). Johnson's acknowledgement of Smith's offer is thus insufficient to meet the requirement of rule 2.507(H) that evidence of the agreement be in writing, since an acceptance of Smith's offer was required to form an agreement. See Metropolitan Life Ins., 418 N.W.2d at 701-02. "[T]he settlement offer and acceptance were not made in open court. Therefore, to be enforceable there must be a writing subscribed by appellants or their attorney. No such writing exists; therefore, the alleged oral settlement agreement is unenforceable." Id. (emphasis added).
 
 
 19
 Johnson also alleges that an oral agreement was reached and that its terms were documented in the proposed consent judgment. However, the proposed consent judgment was unsigned and sent with a cover letter signed only by Johnson's counsel, who is not the party against whom the alleged agreement is offered. Where the requirements of rule 2.507(H) have not been met, a party may later disavow a disputed oral agreement. See Gojcaj, 366 N.W.2d at 58 ("Until plaintiffs or their attorney signed such a writing or the settlement was made in open court, they were free to disavow the alleged oral agreement."). A party may not disavow an alleged oral agreement if it is both proved and undenied. Id. In this case, however, it is denied by Smith.
 
 
 20
 Johnson also argues that the August 26 letter contains the terms of an oral agreement reached during the September 13 conversation between Benefiel and Halan. Therefore, according to Johnson, the letter is written evidence of the oral agreement which satisfies the rule's "writing" requirement. Johnson argues that it accepted the offer in the August 26 letter and that the alleged counteroffer contained nothing more than mere precatory terms which did not extinguish the original offer. See, e.g., Butler v. Foley, 179 N.W. 34, 36 (Mich.1920) (stating that the addition of the words "Please ship stock to-day [sic]. Draft attached." in an acceptance were "simply precatory and do not affect the binding character of the contract").
 
 
 21
 Johnson in effect relies upon testimony regarding a disputed oral agreement to supplement the August 26 letter. Preliminarily we note that the offer contained in the letter, having been rejected, was no longer open for acceptance. Moreover, acceptance of such evidence would defeat the purpose of rule 2.507(H) and be inconsistent with its express requirements. See Nelson, 497 N.W.2d at 209 n. 2 (characterizing the rule as "essentially a statute of frauds provision applicable to legal proceedings"). When a party denies an alleged oral agreement, it is insufficient that evidence of an offer be in writing; evidence of an agreement, such as by acceptance of the offer, must be in writing for the agreement to be enforceable. This is true even if the writing contains all the terms of the later alleged agreement. As discussed above, the August 26 letter contains no evidence of an agreement or an acceptance of the offer, and Smith, the party against whom it is asserted, denies that there was an oral agreement. Our facts are distinguishable from those in Energy Acquisition, which Johnson argues involves similar facts. In that case, the plaintiffs' oral acceptance of the defendants' written proposed settlement agreement was later documented in a signed letter, and the defendants did not challenge the validity of the acceptance or deny that there was an oral agreement. Energy Acquisition, 1990 U.S. Dist. LEXIS 11653, at * 2,* 6-* 9.
 
 
 22
 Finally, Johnson argues that Smith's appeal is frivolous as filed and as argued. See State Indus., Inc. v. Mor-Flo Indus., Inc., 948 F.2d 1573, 1578, 20 USPQ2d 1738, 1742 (Fed.Cir.1991). Johnson states that Smith's challenge to the district court's ruling that rule 2.507(H) requires "evidence of the agreement" to be in writing is "inexcusably frivolous in that the district court tracked literally the exact language of a Michigan Court Rule." Johnson also points to Smith's failure to cite in its principal brief the Energy Acquisition case, which, according to Johnson, was the most relevant decision cited to the district court. Johnson also argues that Smith's appeal is frivolous as argued, alleging that Smith has cited inapplicable and irrelevant authorities, ignored opposing relevant authorities, and distorted the facts. See State Indus., 948 F.2d at 1579 n. 4, 20 USPQ2d at 1743 n. 4 (listing types of sanctionable conduct).
 
 
 23
 An appeal is frivolous as filed if "no basis for reversal in law or fact can be or is even arguably shown." Connell v. Sears, Roebuck & Co., 722 F.2d 1542, 1554, 220 USPQ 193, 203 (Fed.Cir.1983). Since Smith's appeal has been successful, it obviously had a reasonable basis for reversal and is therefore not frivolous. See Vandenberg v. Dairy Equip. Co., 740 F.2d 1560, 1569, 224 USPQ 195, 200 (Fed.Cir.1984) ("[I]t is difficult to hold that an appeal is frivolous when it is partially successful."). As to Johnson's argument that the appeal is frivolous as argued, we have reviewed the specific allegations of frivolous conduct in Smith's brief and his attorney's conduct at the hearing, and we conclude that Smith did not engage in sanctionable conduct.
 
 
 24
 We vacate the district court's judgment dismissing Smith's complaint and remand for further proceedings consistent with this opinion.
 
 
 25
 SMITH, Senior Circuit Judge, dissenting.
 
 
 26
 I respectfully dissent because I am unwilling to make an "Erie[1] guess" concerning the dispositive issue of this case: Whether an oral acceptance of a written offer that is subscribed by the attorney of the party to be charged creates an enforceable settlement agreement under Michigan Court Rule 2.507(H). I suggest certifying this unclear state law issue to the Michigan Supreme Court "which bears ultimate responsibility for reconciling the state's competing policy interests." Geib v. Amoco Oil Co., 29 F.3d 1050, 1060 (6th Cir.1994).
 
 Unclear Michigan Law
 
 27
 Reviewing the trial court's factual findings for clear error, there is sufficient evidence that, during a telephone conversation on September 13, Smith's attorney had at least apparent authority to revive the original settlement offer. This offer is embodied in Johnson's August 26 letter that was signed by Smith's attorney. There is also sufficient evidence that Johnson's attorney orally accepted the offer. Therefore, we are presented with the following dispositive state law issue: Whether oral acceptance of a written offer signed by the attorney of the party to be charged creates an enforceable settlement agreement under MCR 2.507(H). As the majority opinion indicates, there is no clear Michigan case law on this point. However, we may properly consider statute of frauds jurisprudence because Michigan courts characterize this provision as "essentially a court rule version of a statute of frauds governing legal proceedings." Brunet v. Decorative Engineering, Inc., No. 178683, 1996 WL 56482 (Mich.App. Feb. 9, 1996) (quoting 3 Martin, Dean & Webster, Michigan Court Rules Practice 125 (3d ed.1986)); see also, Nelson v. Consumers Power Co., 497 N.W.2d 205, 209 n. 2 (Mich.App.1993).
 
 
 28
 Clearly, "by the weight of authority ... a written offer signed by the party sought to be charged, if orally accepted by the person to whom it is made, will be sufficient to satisfy the statute [of frauds]." E. LeFevre, Annotation, Oral acceptance of written offer by party sought to be charged as satisfying statute of frauds, 30 A.L.R.2d 972, 974 § 2 (1953 & Supp.1995) (hereinafter "LeFevre"); see also, 37 C.J.S. Statute of Frauds § 180(c) (1943); 72 Am.Jur.2d Statute of Frauds § 311 (1974) (Necessity of written acceptance of written offer). The rationale is explained as follows:
 
 
 29
 A prepares and signs [a written draft] and sends it to B as an offer, without requiring that B shall accept by signing it. In such a case, B has power to accept and to close the deal by an oral communication, or by a separate writing, signed or unsigned. The written and signed offer of A is sufficient memorandum of the contract making it enforceable against A, when he is the party to be charged in an action subsequently brought. This is the law, even though the writing was signed before any contract came into existence, and even though it has no probative value in proving that B ever accepted. In a suit against A, B's acceptance can be proved by parol evidence. The document is indeed a written expression of the "offer"; it is not a memorial of a "contract." But it clearly authenticates the terms on which A was willing to make a contract; and it goes so far toward eliminating the danger of successful fraud against A that the courts were fully justified in holding it to be a sufficient memorandum. Of course, it is possible for B to lie about having accepted. He may possibly have at first rejected, and then attempted to accept after his power ended. Or, he may have made a counter offer on different terms, that has been accepted by A. But the danger of successful fraud of this sort is very slight. A has sufficient protection in his own testimony and in the fact that B has the burden of proof that he accepted effectively. And at the very worst, A will be held to the very terms that he himself proposed. Perhaps the most common illustration of this sort of case is an offer made by letter or telegram and later accepted orally by the offeree.
 
 
 30
 2 Corbin on Contracts § 503 (1950) (Time of Making the Note or Memorandum--Written Offers).
 
 
 31
 This overwhelming majority view does not end the inquiry because Michigan appears to have followed, and may continue to follow, the minority view that a written offer must be accepted by either a writing or some unequivocal act indicating acceptance (unless the only required act of acceptance is tendering money). 72 Am.Jur. Statute of Frauds § 311 n. 94 (citing Hollingshead v. Morris, 137 N.W. 527 (Mich.1912) (offer to sell real property); Kaufmann v. Burton, 108 N.W. 349 (Mich.1906) (offer to exchange real property)); LeFevre, supra, at 983 § 4 (citing Goodspeed v. Wiared Plow Co., 7 N.W. 902 (Mich.1881); Wardell v. Williams, 28 N.W. 796 (Mich.1886); Kaufmann; and Hollingshead ); 37 C.J.S. Statute of Frauds § 180(c) n. 13 (1943 & Supp.1995) (citing Consolidated Properties, Inc. v. Henry Ford Trade School Alumni Ass'n, 151 N.W.2d 884 (Mich.App.1967)). The majority opinion appears to adopt this minority view.
 
 
 32
 Whether Michigan would apply the minority view to MCR 2.507(H) is unclear because Michigan courts have demonstrated a modern trend toward less rigidity in applying statute of frauds provisions. Northeast Theatre Corp. v. Wetsman, 493 F.2d 314, 317 (6th Cir.1974) ("[T]he trend of interpretation of Michigan law pertaining to satisfaction of the Statute of Frauds in more recent years has been toward somewhat less rigidity.") (citing Goldberg v. Mitchell, 28 N.W.2d 118 (Mich.1947); Gedvick v. Hill, 53 N.W.2d 583 (Mich.1982); Duke v. Miller, 94 N.W.2d 819 (Mich.1959); and Goslin v.Goslin, 120 N.W.2d 242 (Mich.1963)). In adopting a more liberal view of the statute of frauds, the Michigan Supreme Court explained,
 
 
 33
 While the form of the statute has remained essentially unchanged over the centuries, judicial interpretation has undergone considerable evolution .... In contrast with American trial procedure, 17th Century English litigants and their relatives were disqualified from testifying. If a written contract did not exist, a jury was expected to discern and enforce oral contracts, even though the parties and those closest to them could not be heard or cross-examined. It was thought that the requirement of a signed writing greatly enhanced a jury's ability to decide such cases correctly.
 
 
 34
 As this original rationale for the rule gradually disappeared, so did the policy of strict judicial enforcement ....
 
 
 35
 We decline to accept the defendants' invitation to adopt narrow and rigid rules for compliance with the statute of frauds. Instead, we affirm the standard espoused by Professor Corbin and adopted by this Court in Goslin v. Goslin [120 N.W.2d 242 (Mich.1963) ]: "Let us proceed, therefore, with a general consideration of what constitutes a sufficient note or memorandum. We may well start with this one general doctrine: There are few, if any, specific and uniform requirements. The statute itself prescribes none; and a study of the existing thousands of cases does not justify us in asserting their existence. Some note or memorandum having substantial probative value in establishing the contract must exist; but its sufficiency in attaining the purpose of the statute depends in each case upon the setting in which it is found. * * * That is the rule of law to be applied with intelligence and discrimination and not like a pedant playing a game of logomachy."
 
 
 36
 Opdyke Investment Co. v. Norris Grain Co., 320 N.W.2d 836, 840-42 (Mich.1982) (internal footnotes omitted) (emphasis added). The Sixth Circuit recognizes Michigan's modern trend, explaining,
 
 
 37
 In Opdyke, the Michigan Supreme Court held that a letter, signed by the defendant and expressing an intent to build a sports arena, did satisfy the applicable statute of frauds even though a factual issue remained regarding whether the plaintiff had accepted the offer made in the letter to build the sports arena. The court focused on the substantial probative value of the letter in establishing the terms of a contract and the intent of the parties, not whether a contract had been accepted at the time the letter was written. Moreover, the court noted that "an offer may be accepted in any manner reasonable under the circumstances, unless the offeror specifies an exclusive mode of acceptance." Thus, the questions of whether the writing satisfies the applicable statute of frauds and whether a valid offer has been accepted are two distinct issues. In this case, the mode of acceptance was the act of transferring. The fact that the act of acceptance was performed after the letters were written does not impair the letters' substantial probative value in determining the establishment of a contract for the purposes of the statute of frauds.
 
 
 38
 Cattin v. General Motors Corp., 955 F.2d 416, 430-31 (6th Cir.1992); See also, Adell Broadcasting Corp. v. Cablevision Industries, 854 F.Supp. 1280, 1290-92 (E.D.Mich.1994). The Sixth Circuit ruling indicates an oral acceptance is permissible as long as the writing has substantial probative value. But would the Michigan Supreme Court agree?
 
 
 39
 If, notwithstanding its modern trend, Michigan retains some remnants of the minority review, it is arguable that Johnson's subsequent proposed consent judgment provides written "evidence of" Johnson's acceptance which is sufficient to make an enforceable agreement under MCR 2.507(H). The consent judgment contains (1) evidence of Johnson's intent to accept as demonstrated by the initial statement, "All of the parties having consented to the following judgment;" (2) all of the terms of the offer; and (3) an additional term for taxable costs. This at least provides "substantial probative value" in establishing Johnson's acceptance of the settlement offer. Therefore, the dispositive issue on this appeal presents an area of unclear state law, the resolution of which implicates competing policies regarding not only this particular court rule, but Michigan statute of frauds jurisprudence in general.
 
 
 40
 Certification to the Michigan Supreme Court
 
 
 41
 Although the question whether an issue of state law should be certified to the state's highest court is a case of first impression in the Federal Circuit, we are not without precedent in this regard. The inquiry arose on at least two occasions before one of our predecessor courts. In one instance, the question was certified; in the other it was not. See, Isaacson v. United States, 221 Ct. Cl. 831 (1979) (denying petition to certify question to Colorado Supreme Court); A-B Cattle Co. v. United States, 219 Ct. Cl. 624 (1979) (certified question to the Colorado Supreme Court). Most states, including Michigan, have adopted certification procedures that permit the state's highest court to answer questions from federal appellate courts concerning unsettled state law.[2] MCR 7.305(B)(1) (Certified Questions From Other Courts); Wright, supra, at 167 n. 30-32; 12 U.L.A. 49; Federal Procedure, Access to District Courts § 1:690 n. 24 (L.Ed.1995); 1A pt. 2 Moore's Federal Practice p 0.203 n. 1-2 (2d ed.1995). Certification procedures typically permit certification to be raised by a party's motion or by the federal court's own motion. Wright, supra, at 176 n. 57-58; 12 U.L.A. 49 § 2 (1990); Knowles v. United States, 29 F.3d 1261, 1265 n. 8 (8th Cir.1994) ("We review questions of state law de novo, and we believe that we accordingly have an independent discretion of our own to decide whether certification is appropriate.").
 
 
 42
 The Michigan Rules of Court anticipate the need for certification from federal court and specifically provide that, "[w]hen a federal court ... considers a question that Michigan law may resolve and that is not controlled by Michigan Supreme Court precedent, the court may on its own initiative or that of an interested party certify the question to the Michigan Supreme Court." MCR 7.305(B)(1) (Certified Questions From Other Courts). The Michigan Supreme Court favorably commented that federal courts sitting in Michigan "have employed this rule with increasing frequency in recent years," and explained "[i]t is a sound and wisely conceived rule which serves the interests of the efficient administration of justice, promotes comity between the federal and state courts, and, when appropriately invoked, clarifies and respects the jurisdictional prerogatives of state and federal courts." In re Certified Question, Jewell Theatre Corp. v. Patterson, 359 N.W.2d 513, 515 (Mich.1984). In certifying a question to the Michigan Supreme Court, the Sixth Circuit recently stated,
 
 
 43
 We believe that judicious resort to the technique of certification in situations such as this, where an important question of state law has arisen solely in federal court, prevents federal invasion of the state law-making function and avoids needless federal-state friction. Indeed, the Supreme Court has recommended that we use certification to address the problem of authoritatively determining unresolved state law involved in federal litigation. By certifying the ... question before us today, we not only avoid the hazards of attempting to forecast how Michigan courts might rule, but we also afford the Supreme Court of Michigan the opportunity to address a not insubstantial issue under the law of that State. Certification also saves time, energy, and resources and helps build a cooperative judicial federalism.
 
 
 44
 Geib v. Amoco Oil Co., 29 F.3d 1050, 1060-61 (6th Cir.1994) (internal quotations and citations omitted).
 
 
 45
 Other federal circuits have utilized this practice for years and promulgated certification criteria either through formal court rules or case law. Federal Procedure, Access to District Courts § 1:690 n. 22. For example, the Eleventh Circuit recently reaffirmed its liberal certification policy, stating, "Where there is any doubt as to the application of state law, a federal court should certify the question to the state supreme court to avoid making unnecessary Erie 'guesses' and to offer the state court the opportunity to interpret or change existing law." Colonial Properties, Inc. v. Vogue Cleaners, Inc., 77 F.3d 384, 387 (11th Cir.1996) (quoting Mosher v. Speedstar Div. of AMCA Int'l, Inc., 52 F.3d 913, 916-17 (11th Cir.1995)) (emphasis added). The Fifth Circuit, which has the most experience with certification, set forth certification factors as follows:
 
 
 46
 In determining whether to exercise our discretion in favor of certification, we consider many factors. The most important are the closeness of the question and the existence of sufficient sources of state law--statutes, judicial decisions, attorney general's opinions--to allow a principled rather than a conjectural conclusion. But also to be considered is the degree to which considerations of comity are relevant in light of the particular issue and case to be decided. And we must also take into account practical limitations of the certification process: significant delay and possible inability to frame the issue so as to produce a helpful response on the part of the state court.
 
 
 47
 Florida ex rel. Shevin v. Exxon Corp., 526 F.2d 266, 274-75 (5th Cir.1976), cert. denied, 429 U.S. 829 (1976).
 
 
 48
 An inexhaustive list of overlapping factors that federal courts consider regarding certification include: (i) closeness of the state law issue; (ii) amount of state law sources addressing the issue; (iii) degree the state law issue raises considerations of comity; (iv) degree of delay or prejudice that would be caused by certification; (v) likelihood the state law issue will arise again in federal court; (vi) degree that disputed factual issues will inhibit forming a precise legal question; (vii) likelihood of framing the legal issue to produce a helpful response from the state court; (viii) whether the party requesting certification initially chose the federal forum; (ix) whether the state issue is dispositive of at least one claim in controversy; (x) impact of an incorrect decision on state public policy; (xi) burden certification places on the state's highest court; and (xii) likelihood the state will accept certification. Wright, supra, at 173-74 n. 48-54 and 176 n. 58; Federal Procedure, Access to District Courts §§ 1:687-690; 12 U.L.A. 49 n. 2f.
 
 
 49
 With the above factors in mind, I conclude this case presents a certifiable state law issue. This case presents an issue of unclear state law implicating evolving state policies on statute of fraud jurisprudence; we certainly cannot resolve this issue beyond "any doubt," under the Eleventh Circuit standard, nor beyond mere "conjecture," under the Fifth Circuit standard. Michigan statute of frauds issues have arisen and will continue to arise in federal court. The opinions of this court, the court below and those of the Sixth Circuit are creating a conflicting body of federal law concerning Michigan statute of frauds provisions. Indeed, a substantial portion of the majority opinion in this case seeks to distinguish federal decisions regarding unsettled Michigan law. Slip Op. at 5, 9 (discussing Energy Acquisition Corp. v. Harbor Insurance Co., 1990 U.S. Dist. LEXIS 11653 (W.D.Mich.1990)). It is improvident to create such a situation, especially where Michigan frequently accepts certification from federal courts. There is no indication certification will cause undue delay or prejudice; moreover, the state court's ruling may serve judicial economy by avoiding our erroneous remand for a full trial. Not only is this state issue dispositive of the entire case, there are no substantive federal law issues whatsoever. Finally, this issue is particularly suited for certification because there are no disputed factual issues left to be resolved, and the legal issues may be narrowly framed: (1) Does an oral acceptance of a written offer that is signed by the attorney of the party to be charged create an enforceable settlement agreement under MCR 2.507(H)? (2) If not, does the subsequent written consent judgment provide sufficient evidence of an agreement? I suggest the Federal Circuit take this unique opportunity to consider certification of state issues and forego making an improvident " Erie guess." The alternative to this most certain of routes to resolution will result in continued uncertainty and a situation akin to an aspect of military life during World War II which gave rise to the following axiom, ex regulationo: "When uncertain or in doubt, run in circles, scream and shout--and make ten copies."
 
 
 
 [1]
 Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938)
 
 
 [2]
 Certification is related to the abstention doctrine, and first came to public attention in 1960 when the Supreme Court commented favorably on an obscure Florida statute permitting the state's supreme court to answer state law questions certified by a federal appellate court. 17A Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction 2d § 4248 160-61(1988) (Certification to State Court) (discussing Clay v. Sun Insurance Office Ltd., 363 U.S. 207 (1960)) (hereinafter "Wright"); Uniform Certification of Questions of Law Act, 12 U.L.A. 49, 50-51 (citing Fla. Stat. Ann. § 25.031 and Fla.App. R. 4.61). In 1967, the Commissioners on Uniform State Law approved a Uniform Certification of Questions of Law Act, and the American Law Institute proposed a similar statute. However, certification did not gain prominence until after 1974 when the Supreme Court enthusiastically encouraged federal courts to exercise their discretion in utilizing this procedure. Lehman Brothers v. Schein, 416 U.S. 386 (1974); Wright, supra, at 162-164; 12 U.L.A. 49 (1990); American Law Institute, Study of the Division of Jurisdiction between State and Federal Courts, Official Draft 1969, § 1371(e)